**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | : | CASE NO. _____ |
| OF THE UNITED STATES OF AMERICA | : | |
| FOR A SEARCH WARRANT FOR THE | : | |
| PREMISES LOCATED AT | : | |
| 1369 SAVANNAH STREET, | : | |
| SOUTHEAST, APT. 5 | : | |
| WASHINGTON, D.C.  20032 | : | **FILED UNDER SEAL** |

**AFFIDAVIT**

Your affiant, Samuel R. Katz, a Special Agent with the Bureau of Alcohol, Tobacco,

Firearms and Explosives (ATF), assigned to the Washington, D.C., High Intensity Drug

Trafficking Area Task Force (HIDTA), having been duly sworn, depose and state as follows:

**I.   TRAINING AND EXPERIENCE**

1.      I have been a Special Agent with the ATF since January 2010.  I am currently

assigned to the Washington, D.C. metropolitan area HIDTA Task Force and have attended

numerous schools and training venues hosted by the ATF, HIDTA, and the Department of

Justice, dealing in various techniques of investigating firearm and narcotics related crime.  Since

becoming a Special Agent with the ATF, I have taken part in numerous federal, state and local

investigations concerning violations of firearm and narcotic laws.

2.      During my tenure with the ATF, I have become familiar with the methods and

techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the

organization of drug conspiracies.  In the course of conducting these investigations, I have been

involved in the preparation, presentation and execution of numerous search and arrest warrants

which have resulted in the recovery of firearms, narcotics, currency and documentary evidence

indicative of firearm and narcotic trafficking organizations.  Many of these investigations have

resulted in arrests leading to convictions for violations of federal firearm laws and violations of

the Controlled Substances Act.  During these investigations, I have been involved in the use of the following investigative techniques: interviewing confidential sources and cooperating witnesses; conducting physical surveillance, conducting short and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register data; requesting, collecting and analyzing billing records; and conducting court-authorized electronic surveillance.

3.     Through instruction and participation in firearms and narcotics related investigations, I have become familiar with the manner and methods in which narcotics traffickers conduct their illegal business.  I know that it is common for individuals who sell narcotics to amass large amounts of cash proceeds from illegal drug sales.  I am aware that unexplained wealth is probative evidence of illegal activities, such as drug trafficking.  I have learned that drug traffickers often place assets in corporate entities or in names other than their own in an effort to avoid detection of these assets by government agencies.  I have also learned that drug traffickers are often engaged in a legitimate business, which may produce legitimate income for them; however, their business commonly becomes nothing more than a business "front" i.e., a point of drug distribution.  In addition, the business provides a means of laundering drug income, whereby the drug trafficker can commingle their drug proceeds with legitimate income earned by the business.  Further, based upon my knowledge, training, experience and participation in firearms and narcotics trafficking investigations, I know that:

a.     Individuals who deal in the sale and distribution of illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders and other papers relating to the importation, manufacture, transportation, ordering, sale and

distribution of illegal controlled substances.  These items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

      b.    Individuals involved in the sale and distribution of illegal controlled substances often own, possess and/or use firearms as a means of facilitating their illegal drug activities.  These firearms are often used to protect and secure a drug trafficker's narcotics supply and/or cash proceeds acquired from the sale and distribution of illegal controlled substances from theft by other criminals.  Drug traffickers also possess firearms as a means of enforcing drug transactions, i.e., as a means of ensuring payment for the drugs they are selling.  Persons who possess or collect firearms also keep other firearm related equipment, to include ammunition, ammunition magazines, holsters, bullet proof vests, pistol grips, pistol boxes, cleaning kits, pictures of firearms and paperwork relating to the acquisition and disposition of firearms.  The aforementioned items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

      c.    Individuals who deal in the sale and distribution of illegal controlled substances routinely conceal large quantities of currency, financial instruments, precious metals, jewelry, and other items of value, typically proceeds of illegal controlled substance transactions. Indeed, when drug traffickers amass large proceeds from the sale of drugs, they often attempt to

legitimize or "launder" these profits. To accomplish this, drug traffickers may utilize domestic and foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks, money drafts, letters of credit and safe deposit boxes. All of these items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

d.      Individuals who deal in the sale and distribution of illegal controlled substances often secrete contraband and tools related to those activities such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, pots, dishes and other containers for preparing crack cocaine and other controlled substances for distribution. These items are often found in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

e.      Individuals who deal in the sale and distribution of controlled substances commonly maintain telephone numbers and address books or papers which reflect names, addresses and/or telephone numbers for their associates. These individuals often utilize cellular telephones to maintain contact with their associates in their illegal businesses. These telephone records, bills and paper numbers are often found in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding

curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

    f.  Individuals who deal in the sale and distribution of illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband. These items are often found in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

    g.  Individuals who deal in the sale and distribution of illegal controlled substances stay in regular contact with one another. This contact does not terminate once an individual is incarcerated. Incarcerated members of drug organizations routinely send letters to and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, from financial help to help in engaging in witness intimidation or elimination. In addition, incarcerated members often keep photographs of themselves and other members of their organization in order to obtain respect from other inmates. These items are often found in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

h.     Individuals who engage in the sale and distribution of illegal controlled substances often utilize electronic equipment, such as computers, personal data assistants (PDA's), digital cameras, scanners, and/or facsimile machines to generate (in the form of electronic data), store, transfer and/or print documents containing information regarding financial transactions involving assets that are typically acquired from proceeds of illegal controlled substance transactions.   These items are often found in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

4.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."  See 18 U.S.C. § 1030(e)(1).

b.     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards,

printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

c.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

d.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

## II.    BACKGROUND

### A.    <u>BACKGROUND OF INVESTIGATION</u>

5.      As part of your affiant's current assignment, your affiant and others have been investigating narcotics and firearms trafficking by several individuals in the District of Columbia and elsewhere: WILLIAM JAMES TRUESDALE, also known as "Smoke" and "Smokey," DWIGHT ERNEST WILLIAMS, DACO EARL NOLEN, and others known and unknown (collectively, the "subject individuals").   The investigation has revealed that the subject

individuals have committed, are committing, and will continue to commit the following offenses in the District of Columbia and elsewhere, which are among the offenses enumerated in 18 U.S.C § 2516: (i) conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846; (ii) unlawful distribution of heroin and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2; (iii) unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1); (iv) using, carrying and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1); (v) engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. §922(a)(1)(A); and (vi) unlawful distribution of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (collectively, the "subject offenses").

6.     As described in greater detail below, the investigation has revealed that the subject individuals and others are participating in a conspiracy to distribute and possess with intent to distribute controlled substances, the distribution of controlled substances, and firearms possession and trafficking offenses, and that these subject individuals are in possession of the fruits, evidence, and instrumentalities of violations of the subject offenses, among others. Specifically, there is probable cause to believe that within the confines of 1369 Savannah Street S.E., #5, Washington, D.C. 20032 (the "subject premises"), as further described in Attachment A, there exists evidence and instrumentalities of the subject offenses, as set forth more fully in Attachment B.

7.     I have participated in the investigation of the offense set forth below.  The facts and information contained in this affidavit are based upon my personal knowledge, information obtained during controlled purchases of illegal narcotics and firearms, information obtained from

physical surveillance, information obtained from federal, state and local law enforcement officers and information obtained from interviews and analysis of reports. In several instances I have received information from a confidential informant (CW-1). This information is denoted as such in this affidavit. To the extent possible, information provided by CW-1 relevant to this investigation has been corroborated through law enforcement or other secondary reliable sources. All observations referenced in this affidavit that were not made by me were related to me by the person who made such observations. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements. Additionally, wherever in this affidavit I quote statements made by an individual; those quotations have been taken from draft transcripts/summaries of those statements, which are subject to further revision.

8.     I have not set forth each and every fact learned during the course of this investigation. I have set forth only those facts which establish the foundation for probable cause. Facts not set forth herein are not being relied upon to establish probable cause. Nor do I request that this Court rely upon any facts not set forth herein in reviewing this affidavit in support of a search warrant for the subject premises.

**B.     RELEVANT STATUTES**

9.     This investigation concerns alleged violations of Title 21, United States Code, Section § 841(a)(1), which prohibits the knowing or intentional manufacturing, distribution, or dispensation, or possession with intent to manufacture, distribute, or dispense, a controlled substance, including a mixture or substance containing detectable amounts of heroin and cocaine. This investigation also concerns alleged violations of Title 21, United States Code, Section § 846, which prohibits attempts and conspiracies to violate federal narcotics laws, including but

not limited to violations of Title 21, United States Code, Section § 841(a)(1).  This investigation also concerns alleged violations of 18 U.S.C. § 922(g), which prohibits the possession of firearms and ammunition by anyone who has been convicted of a crime punishable by imprisonment for a term exceeding one year.  This investigation further concerns alleged violations of 18 U.S.C. § 924(c)(1), which prohibits using, carrying and possessing a firearm during a drug trafficking offense, in violation.  Finally, the investigation concerns alleged violations of 18 U.S.C. §922(a)(1)(A), which prohibits the engaging in the business of dealing in firearms without a license.

## II.    PROBABLE CAUSE AS TO NARCOTICS AND FIREARMS TRAFFICKING.

### A.    <u>BACKGROUND</u>

10.    Since December 2013 to present, reliable information received from CW-1, controlled narcotics purchases by an undercover officer (UC), telephone data analysis, audio and video surveillance, and physical surveillance establish probable cause to believe that WILLIAM JAMES TRUESDALE, also known as "Smoke" and "Smokey," and DWIGHT ERNEST WILLIAMS, DACO EARL NOLEN, and others known and unknown have been trafficking controlled substances and firearms in the District of Columbia.

### B.    <u>CONTROLLED NARCOTICS BUYS</u>

#### 1.    Cooperating Witness Background

11.    CW-1 has been cooperating with law enforcement since December 2013, at which time CW-1 began working for officers and detectives of the Metropolitan Police Department (MPD) 7th District Vice Units.  Since that time, the CW-1's assistance led to pending investigations which resulted in the recovery of numerous firearms, ammunition and narcotics.  CW-1 has made numerous controlled buys for the ATF since CW-1's time working with the

ATF; to which the CW-1 has continuously provided reliable and current information.  CW-1 has also played an integral role in this investigation and others by introducing law enforcement personnel acting in an undercover capacity to various narcotics and firearms distributors for the purpose of gathering additional evidence necessary for prosecution.  CW-1 is considered a reliable source and has never provided information that has been proven false.  CW-1 has been paid for the assistance provided in the past, and also has received compensation in this investigation for participation in the controlled narcotics purchases and introduction of a UC, as further discussed below.

### 2.    Undercover Officer Information

12.    The UC has been working as a sworn officer with MPD for over 21 years.  The UC is a Detective assigned to MPD's Narcotics and Special Investigations Division (NSID), but detailed to the ATF.  The UC had been detailed to the Drug Enforcement Administration (DEA) for over 4 years.  The UC has attended several schools administered by the MPD and the DEA, which include drug recognition, court expert witness school, undercover and confidential source school, interview and interrogation, and two investigator's schools.  The UC has been the affiant in at least 200 search warrants for various violations of the law of the District of Columbia and the United States. These warrants have resulted in the seizure of numerous firearms, confiscation of narcotics and U.S. currency, with numerous arrests.  The UC has participated in the execution of over 800 search warrants and investigations.  This has resulted in at least 400 gun-related arrests and more than 2,500 narcotic arrests.  The UC has participated in over hundreds undercover purchases of illicit drugs and firearms, and has worked in an undercover capacity for over 20 years.

### 3.     Procedures

13.     From December 13, 2013, through July 29, 2014, members of the ATF and MPD conducted fourteen (14) controlled narcotics and firearms purchases from TRUESDALE utilizing CW-1 and the UC.  On at least three of those occasions, WILLIAMS is suspected of providing narcotics to provide to CW-1 and the UC.  On at least one of those occasions, NOLAN is suspected of providing a firearm to TRUESDALE to provide to CW-1 and the UC.  CW-1 conducted the first two controlled narcotics purchase before introducing the UC to TRUESDALE during the course of the third controlled narcotics purchase.  Per standard protocol, and for each of the controlled purchases described below, CW-1 was searched by agents, detectives, or officers and determined to be free of contraband and money prior to, and at the conclusion of each drug buy.  Each controlled purchase or payment was made with pre-recorded MPD or ATF funds.  The controlled buys were arranged with calls being made by CW-1 to TRUESDALE on TRUESDALE's cell phone. The ATF obtained one-party consensual audio and/or video recordings of many of the controlled buys from recording devices secreted on CW-1, the UC, or in a vehicle.  Following each of the controlled buys, CW-1 and the UC turned over the narcotics and firearms evidence to MPD or ATF.  A portion of the narcotics evidence from each of the drug buys was field tested by MPD or ATF personnel at the conclusion of drug buy operation.   All the narcotics evidence sold by TRUESDALE and WILLIAMS was forwarded to the DEA Mid-Atlantic Laboratory for analysis.

### C.     THE INVESTIGATION

### 1.     December 13, 2013

14.     On December 13, 2013, law enforcement met with CW-1 and provided $400 of pre-recorded funds for the purchase of 5 grams of heroin from TRUESDALE.  When CW-1

arrived at the buy location in the 2000 block of Savannah Terrace, S.E., CW-1 called TRUESDALE on TRUESDALE's cell phone. TRUESDALE instructed CW-1 to wait in the block. Two individuals, later identified as TRUESDALE and WILLIAMS, entered the block in a 2000 four-door blue Cadillac bearing D.C. registration EL8578 and vehicle identification number (VIN) 1G6KF5795YU334895. The vehicle, whose registration expired on January 24, 2014, is registered to WILLIAMS at his residence, located at 3412 25th Street, S.E., Washington, D.C. 20020. TRUESDALE exited the driver's seat of the Cadillac and spoke with CW-1, before entering 2001 Savannah Terrace, S.E. WILLIAMS remained in the passenger seat of the vehicle. TRUESDALE returned several minutes later and provided CW-1 with approximately 5 grams of heroin in exchange for U.S. currency. CW-1 further informed law enforcement that WILLIAMS was TRUESDALE's narcotics supplier. The heroin purchased from TRUESDALE field tested positive for opiates.

## 2.      December 21, 2013

15.      On December 21, 2013, law enforcement met with CW-1 and provided $400 of pre-recorded funds for the purchase of 5 grams of heroin from TRUESDALE. CW-1 called TRUESDALE on TRUESDALE's cell phone, and they arranged to meet in the 2000 block of Savannah Terrace, S.E. CW-1 arrived in the block and TRUESDALE got into CW-1's vehicle. TRUESDALE then exited the vehicle and entered 2001 Savannah Terrace, S.E. TRUESDALE returned and provided CW-1 with approximately 5 grams of heroin in exchange for U.S. currency. TRUESDALE then returned to 2001 Savannah Terrace, S.E. The heroin purchased from TRUESDALE field tested positive for opiates.

### 3.      February 11, 2014

16.      On February 11, 2014, law enforcement met with CW-1 and provided him with $1000 of pre-recorded funds for the purchase of heroin from TRUESDALE.  When CW-1 and the UC arrived at the buy location in front of 2001 Savannah Terrace, S.E., TRUESDALE exited that residence and got into the vehicle in which CW-1 and UC were riding.  TRUESDALE then directed CW-1 and the UC to drive to 1369 Savannah Street S.E., #5, Washington, D.C. 20032 (the subject premises).  Once they arrived at that location, TRUESDALE exited the vehicle and entered that residence.  TRUESDALE then returned to the vehicle and provided CW-1 and the UC with a clear plastic bag containing a light brown rock-like substance in exchange for U.S. currency.  The substance field tested positive for opiates and weighed approximately 11.2 grams.

### 4.      February 18, 2014

17.      On February 18, 2014, law enforcement met with CW-1 and the UC, and provided the UC with $2000 of pre-recorded funds for the purchase of heroin from TRUESDALE.  When CW-1 and arrived at the buy location at 1369 Savannah Street S.E., #5, Washington, D.C. 20032, CW-1 called TRUESDALE on TRUESDALE's cell phone. TRUESDALE then arrived at the scene and got into the vehicle in which CW-1 and UC were riding.  TRUESDALE then directed CW-1 and the UC to drive to 2001 Savannah Terrace S.E. Once they arrived at that location, TRUESDALE exited the vehicle and entered that residence. TRUESDALE then returned to the vehicle and provided the UC with a clear plastic bag containing a light brown rock-like substance in exchange for U.S. currency.  TRUESDALE then returned to 2001 Savannah Terrace, S.E.  The substance field tested positive for opiates and weighed approximately 25.3 grams.

### 5.    March 10, 2014

18.     On March 10, 2014, law enforcement met with CW-1 and the UC, and the CW-1 called TRUESDALE on TRUESDALE's cell phone.  Law enforcement also provided the UC with $5300 of pre-recorded funds for the purchase of heroin and a firearm from TRUESDALE. CW-1 and the UC then arrived at the buy location at 1309 Congress Street, S.E., #31, Washington, D.C. 20032.  TRUESDALE then arrived at the scene and provided the UC with a clear plastic bag containing a white powder substance in exchange for U.S. currency.  The substance field tested positive for opiates and weighed approximately 44.7 grams with packaging.

### 6.    March 27, 2014

19.     On March 27, 2014, law enforcement met with CW-1 and the UC, and the CW-1 called TRUESDALE on TRUESDALE's cell phone.  Law enforcement also provided the UC with $2800 of pre-recorded funds for the purchase of heroin and a firearm from TRUESDALE. CW-1 and the UC then arrived at the buy location at 1369 Savannah Street S.E., Unit #5, Washington, D.C. 20032 (the subject premises).  TRUESDALE then arrived at the scene and entered the passenger seat of the vehicle in which CW-1 and the UC were riding.  TRUESDALE received a call on his cell phone as a WILLIAMS's light blue Cadillac, with D.C. license plate EL 8578, and driven by WILLIAMS, pulled up and parked behind the vehicle with CW-1, the UC, and TRUESDALE were sitting.  TRUESDALE then exited the vehicle and got into the passenger seat of WILLIAMS's vehicle.  TRUESDALE returned to the vehicle and provided the UC with a clear plastic bag containing a white powder substance in exchange for U.S. currency. TRUESDALE then returned to WILLIAMS's vehicle and left the scene.  The substance field tested positive for opiates and weighed approximately 20.8 grams with packaging.

### 7.      April 14, 2014

20.      On April 14, 2014, law enforcement met with CW-1 and the UC, and CW-1 called TRUESDALE on TRUESDALE's cell phone.  Law enforcement also provided the UC with $3500 of prerecorded funds for the purchase of heroin and a firearm from TRUESDALE. CW-1 and the UC then arrived at the buy location at 1369 Savannah Street S.E., Unit #5, Washington, D.C. 20032 (the subject premises).  TRUESDALE then arrived at the scene and entered the passenger seat of the vehicle in which CW-1 and the UC were riding.  TRUESDALE exited the vehicle, walked around the side of 1369 Savannah Street S.E., returned to the vehicle carrying a green bag containing.  TRUESDALE provided the UC with a clear plastic bag containing a white powder substance and a white t-shirt concealing a nickel-finished COBRA, Model FS32, .32-caliber firearm in exchange for U.S. currency.  The substance field tested positive for opiates and weighed approximately 21.3 grams with packaging.  Further investigation revealed that TRUESDALE has a previous felony conviction and does not have a license to deal firearms.  Further investigation also revealed that NOLEN does not have a license to deal firearms.

### 8.      May 6, 2014

21.      On May 6, 2014, law enforcement met with CW-1 and the UC, and CW-1 called TRUESDALE on TRUESDALE's cell phone.  Law enforcement also provided the UC with $2600 of prerecorded funds for the purchase of cocaine and firearms from TRUESDALE.  CW-1 and the UC then arrived at the buy location in the 1300 block of Savannah Street S.E., Washington, D.C. 20032.  CW-1 then placed another call to TRUESDALE on TRUESDALE's cell phone to inform him that they were in the area.  TRUESDALE then arrived at the scene and entered the passenger seat of the vehicle in which CW-1 and the UC were riding.  TRUESDALE

exited the vehicle before returning several minutes later.  TRUESDALE provided the UC with a white powder substance in exchange for U.S. currency.  The substance field tested positive for the presence of cocaine and weighed approximately 33.3 grams with packaging.

### 9.    May 9, 2014

22.    On May 9, 2014, law enforcement met with CW-1 and the UC, and CW-1 called TRUESDALE on TRUESDALE's cell phone.  Law enforcement also provided the UC with $1800 of prerecorded funds for the purchase of a firearm from TRUESDALE.  CW-1 and the UC then arrived at the buy location in the 1300 block of Savannah Street S.E., Washington, D.C. 20032.  TRUESDALE then arrived at the scene and entered the passenger seat of the vehicle in which CW-1 and the UC were riding.  TRUESDALE directed the vehicle to a location near the intersection of Alabama Avenue and 22nd Street, S.E.  TRUESDALE then made a call on his cell phone to a suspected firearms supplier.  TRUESDALE then directed the vehicle to the side parking lot of 2001 Savannah Terrace S.E., where it was met by a black Nissan.  TRUESDALE and the UC then exited the vehicle and met with the driver of the black Nissan, which law enforcement later identified as DACO EARL NOLEN, at the trunk of that vehicle.  The driver of the black Nissan provided the UC with a black and white bag, containing a Norinco model SKS-Sporter, .762-caliber rifle, which the UC then placed in his vehicle.  NOLEN indicated to the UC that he would be able to provide additional firearms in the future, and for the UC to contact TRUESDALE to arrange such transactions.  The UC then gave TRUESDALE U.S. currency as payment for the firearm.  TRUESDALE then left the scene and entered into 2001 Savannah Terrace, S.E.

### 10.    May 21, 2014

23.     On May 21, 2014, law enforcement met with CW-1 and the UC, and CW-1 called TRUESDALE on TRUESDALE's cell phone.  Law enforcement also provided the UC with $3500 of prerecorded funds for the purchase of cocaine and firearms from TRUESDALE.  CW-1 and the UC then arrived at the buy location at 2001 Savannah Terrace, S.E., Washington, D.C. 20020.  TRUESDALE then entered the passenger seat of the vehicle in which CW-1 and the UC were riding.  TRUESDALE provided the UC with a clear plastic bag containing a white powder substance in exchange for U.S. currency before exiting the vehicle.  The substance weighed approximately 25.1 grams with packaging, but did not field test positive for cocaine.

### 11.     June 11, 2014

24.     On June 11, 2014, law enforcement met with CW-1 and the UC, and CW-1 called TRUESDALE on TRUESDALE's cell phone.  Law enforcement also provided the UC with $1000 of prerecorded funds for the purchase of firearms from TRUESDALE.  CW-1 and the UC then arrived at the buy location at 2001 Savannah Terrace, S.E., Washington, D.C. 20020. TRUESDALE then entered the passenger seat of the vehicle in which CW-1 and the UC were riding.  TRUESDALE provided the UC with a Smith & Wesson Model 36 .38-caliber firearm, loaded with 5 rounds of ammunition and contained inside a leather holster in exchange for U.S. currency.  TRUESDALE then exited the vehicle and returned to 2001 Savannah Terrace, S.E.

### 12.     June 19, 2014

25.     On June 19, 2014, law enforcement met with CW-1 and the UC, and provided the UC with $2600 of prerecorded funds for the purchase of firearms from TRUESDALE.  CW-1 and the UC then arrived at the buy location at 2001 Savannah Terrace, S.E., Washington, D.C. 20020 .  CW-1 called TRUESDALE on TRUESDALE's cell phone.  TRUESDALE then entered the passenger seat of the vehicle in which CW-1 and the UC were riding.  TRUESDALE

directed the vehicle to Congress Street, S.E., where TRUESDALE exited the vehicle. TRUESDALE explained that he was waiting for his gun source to arrive.  Shortly thereafter, TRUESDALE and an unknown male were observed entering 2001 Savannah Terrace, S.E.  CW-1 and the UC then returned to 2001 Savannah Terrace, S.E., where TRUESDALE and the unknown male approached the vehicle.  A BMW arrived on the scene, and the unknown male directed the vehicle to the parking lot of 2001 Savannah Terrace, S.E.  The unknown male retrieved a handgun from the BMW and entered the vehicle in which CW-1 and the UC were riding.  The unknown male provided the UC with a Hi-Point, Model CF, .380-caliber pistol in exchange for U.S. currency.  The unknown male then returned to the BMW and provided money to the driver of that vehicle.  Shortly thereafter, a second vehicle, a Chevrolet Malibu arrived on the scene and approached the parking lot of 2001 Savannah Terrace, S.E. under the direction of the unknown male.  TRUESDALE entered the rear seat of the Chevrolet Malibu.  TRUESDALE, the unknown male, and the two occupants of the Chevrolet Malibu then gathered in the parking lot before TRUESDALE placed a Norinco, Mak-90 Sporter, .762-caliber rifle, which was wrapped inside a grey bed sheet within a black bag, into the trunk of the UC's and CW-1's vehicle.  The unknown male again entered the UC's and CW-1's vehicle, and the UC provided the unknown male U.S. currency.  TRUESDALE then got into the Chevrolet Malibu before it left the scene.

### 13.    July 15, 2014

26.    On July 15, 2014, law enforcement met with CW-1 and the UC, and provided the UC with $2400 of prerecorded funds for the purchase of firearms from TRUESDALE.  CW-1 and the UC then arrived at the buy location at 2001 Savanah Terrace, S.E., Washington, D.C. 20020.  CW-1 received a phone call from TRUESDALE, during which TRUESDALE directed

CW-1 and the UC to pick him up in the 1300 block of Savannah Street, S.E.  After CW-1 and the UC picked up TRUESDALE as directed, the three returned to 2001 Savanah Terrace, S.E., Washington, D.C.   TRUESDALE exited the vehicle and entered 1924 and 2001 Savannah Terrace, S.E.   TRUESDALE then exited the residence and spoke with CW-1 and the UC.  TRUESDALE then approached a green van parked in front of 2001 Savannah Terrace, S.E. and met with WILLIAMS, who was inside.    The van, a 2003 Dodge, bearing D.C. registration EP 2735 and VIN 1D4GP24393B312016, is registered to WILLIAMS at his residence, located at 3412 25th Street, S.E., Washington, D.C.  20020.  TRUESDALE then provided the UC with clear plastic bag containing a white/tan power substance.  TRUESDALE stated to the UC and CW-1 that WILLIAMS was holding "weight" in the green van and gave a pinch to TRUESDALE to give to the UC and CW-1.   Following the transaction, law enforcement observed TRUESDALE, WILLIAMS, and another individual sitting on a wall outside the van in front of 2001 Savannah Terrace, S.E.  TRUESDALE later entered 2001 Savannah Terrace, S.E.  The substance field tested positive for opiates.

### 14.    July 29, 2014

27.    On July 29, 2014, law enforcement met with CW-1 and the UC, and provided the UC with $2400 of prerecorded funds for the purchase of firearms from TRUESDALE.  CW-1 and the UC then arrived at the buy location at 2001 Savannah Terrace, S.E., Washington, D.C. 20020.  TRUESDALE exited 2001 Savannah Terrace, S.E., and got into the vehicle, carrying a black backpack.  TRUESDALE then exited the vehicle and returned to 2001 Savannah Terrace, S.E.   A Chevrolet Malibu arrived and parked next to the UC's and CW-1's vehicle. TRUESDALE then exited 2001 Savannah Terrace, S.E. and approached the vehicles.   An unknown male exited the Chevrolet Malibu and placed in the trunk of the UC's and CW-1's

vehicle a bag containing a Norinco SKS .762-caliber rifle with a magazine.  TRUESDALE also provided the UC with a Smith and Wesson, Model 10, .38-caliber revolver with .38 rounds of assorted .38-caliber ammunition, in exchange for U.S. currency.

## III.    PROBABLE CAUSE AS TO THE SUBJECT PREMISES

28.    As described in greater detail above, TRUESDALE is a seller of narcotics and firearms.  Several instances of TRUESDALE's narcotics and firearms transactions are described above in detail.

29.    During some of these transactions, as also described above in detail, TRUESDALE entered 1369 Savannah Street, Unit 5, S.E., Washington, D.C., 20032 (the subject premises), and some of these transactions occurred in front of or in the parking lot of that location.

30.    On or about September 2, 2014, TRUESDALE informed CW-1 that he and his wife were having marital problems, and that TRUESDALE was temporarily staying at his aunt's residence, located at 1369 Savannah Street, Unit 5, S.E., Washington, D.C., 20032 (the subject premises).  TRUESDALE further informed CW-1 that he currently has three additional firearms and a quantity of narcotics that he wishes to sell to CW-1 and the UC.  However, some of TRUESDALE's belongings remain at 2001 Savannah Terrace, S.E., Apt. J, which he shares with his wife.

31.    Law enforcement officers know that when narcotics traffickers amass large proceeds – that is, large quantities of cash -- from the sale of drugs that they attempt to legitimize these profits through money laundering activities.  To accomplish these goals, narcotics traffickers utilize, including, but not limited to, business fronts or otherwise legitimate businesses which generate large quantities of currency.  Law enforcement officers also know that when

narcotics traffickers want to conceal their income derived from drug trafficking they purchase property through straw purchasers, or stated differently, through individuals who have legitimate jobs and appear to be purchasing property for legitimate personal and/or business reasons. Furthermore, law enforcement officers know that narcotics traffickers, who almost exclusively use cash to facilitate their drug transactions and often have large amounts of cash to use for their personal business transactions, often use straw purchasers, such as personal friends, family members, or girlfriends, to make payments for property, such as residences or vehicles, used by these drug traffickers to facilitate their drug trafficking activities or to help them sustain a lifestyle above that which they would be able to obtain absent their illegal conduct.  Law enforcement officers also know that those involved in narcotics trafficking maintain records and other documentary evidence related to such narcotics activity for extended periods of time.

## IV.     COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

32.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the subject premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices.  As used herein, the terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks,

USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of electronic storage media and digital devices or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

33.     *Probable Cause.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that if electronic storage media or digital devices are found on the subject premises, there is probable cause to believe that the records and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

a.      Individuals who engage in narcotics and firearms trafficking use digital devices to communicate with co-conspirators online, but that they also store on computer hard drives and other electronic storage media documents and records relating to their illegal activity. Online criminals store these documents and records, which can include logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change computers, will often "back up" or transfer files from their old computers' hard drives to that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

34.     *Forensic Evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices in the subject premises because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.   Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive,

flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be

merely reviewed by a review team and passed along to investigators.   Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.       Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.   For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.       I know that when an individual uses a digital device to engage in narcotics and firearms trafficking, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.   The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.   The digital device is also likely to be a storage medium for evidence of crime.   From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

35.     *Methods To Be Used To Search Digital Devices.*   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.  Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain enormous amounts of data.

d.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

e.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the

hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

f.      Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro,"

disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

g.      Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.   Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.   In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

h.      In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      Upon securing the subject premises, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any electronic storage media or digital devices, as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.   For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such electronic storage media or digital devices at the premises.   The electronic storage

media and digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

2.     The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.     In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## V.       CONCLUSION

36.     Your affiant asserts that the facts contained within this affidavit establish probable cause to believe that the fruit, evidence and instrumentalities of violations of the laws of the United States, specifically: (i) conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846; (ii) unlawful distribution of heroin and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2; (iii) unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1); (iv) using, carrying and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1); (v) engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. §922(a)(1)(A); and (vi) unlawful distribution of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C)  (collectively, the "subject offenses"), are presently to be found in the subject premises, located at 1369 Savannah Street, Unit 5, S.E., Washington, D.C., 20032. This evidence and instrumentalities, or documents, records, and related material, specifically include those items listed in Attachment B to this Affidavit in Support of a Search Warrant.  This Attachment B is incorporated herein by reference.  Therefore, in light of the circumstances and

the evidence obtained during this investigation, your affiant respectfully submits that probable

cause exists for the issuance of a search warrant for the subject premises.

Respectfully submitted,


_____

SAMUEL P. KATZ
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives



Subscribed and sworn to before me this _____ of October, 2014.


_____
THE HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE APPLICATION** | : | **CASE NO. _____** |
| **OF THE UNITED STATES OF AMERICA** | : | |
| **FOR A SEARCH WARRANT FOR THE** | : | |
| **PREMISES LOCATED AT** | : | |
| **1369 SAVANNAH STREET,** | : | |
| **SOUTHEAST, APT. 5** | : | |
| **WASHINGTON, D.C.  20032** | : | **FILED UNDER SEAL** |

**ATTACHMENT A**

**DESCRIPTION OF SUBJECT PREMISES**

The address known as 1369 Savannah Street, S.E., Apt. 5, Washington, D.C.  20032, is described as a dark red brick multi-story apartment building.   The apartment entrance is located at what appears to be the middle level of the building, atop a black metal staircase. The door to the apartment is gray with gold "5" displayed in the center of the door.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | : | CASE NO. _____ |
| OF THE UNITED STATES OF AMERICA | : | |
| FOR A SEARCH WARRANT FOR THE | : | |
| PREMISES LOCATED AT | : | |
| 1369 SAVANNAH STREET, | : | |
| SOUTHEAST, APT. 5 | : | |
| WASHINGTON, D.C.  20032 | : | **FILED UNDER SEAL** |

**ATTACHMENT B**

**LIST OF ITEMS AUTHORIZED TO BE SEARCHED-FOR**
**AND SEIZED PURSUANT TO FEDERAL SEARCH WARRANT**
**AT THE TARGET RESIDENCE**

1.      Items used in the sale, transfer, transportation, packaging and use of controlled substances, including scales, butcher paper, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents.

2.      Items used in the manufacture or cooking of controlled substances, including precursor chemicals, chemistry guides, glassware and flasks.

3.      Items used in the sale, transfer, transportation, packaging and use of firearms.

4.      Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances or firearms, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records.

5.      Articles of personal property documenting or containing evidence of the existence of a conspiracy to possess and sell controlled substances or firearms, including personal telephone and address books, telephone bills, photographs and documents consisting of lists of names and or numbers, personal data assistants, computers, and computer storage media including floppy disks, hard disk drives, compact disks and zip disks.

6.      Articles of personal property evidencing or containing the evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of money and assets derived from or to be used in the sale of controlled substances or firearms, including books, receipts, records, bank

statements and records, business records, money drafts, money orders, wire transfer receipts, and cashier's check receipts, passbooks, bank checks, safes, records of safety deposit boxes and storage lockers, personal data assistants, computers, and computer storage media including floppy disks, hard disk drives, compact disks and zip disks.

7.     Proceeds and articles of personal property which are the fruits, instrumentalities and evidence of trafficking in controlled substances or firearms, including U.S. currency, precious metals and stones, jewelry, negotiable instruments and financial instruments including stocks and bonds, which were obtained from the sale of controlled substances or proceeds therefrom.

8.     Photographs of participants and fruits and evidence of the trafficking of controlled substances or firearms.

9.     Weapons, firearms, ammunition and any booby-trap devices.

10.    Equipment used to detect police activities and surveillance, including radio scanners, wire transmitter detectors and closed circuit camera systems.

11.    Documents and articles of personal property showing or containing data showing the identity of persons occupying, possessing, residing in, owing, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility and telephone bills and receipts, photographs, answering machine tape recordings, telephone beeper or pager devices, cellular telephones, wireless telephones, rolodexes, telephone answering pads, storage records, vehicle or vessel records, canceled mail envelopes, correspondence, opened or unopened, financial documents such as tax returns, bank records, safety deposit box records, canceled checks and other records of incomes and expenditures, credit card and bank records, personal data assistants, computers, and computer storage media including floppy disks, hard disk drives, compact disks and zip disks.

12.    Documents showing travel to and from source/distribution areas for narcotics or firearms and documents showing travel to and from consumer areas for narcotics or firearms including foreign and domestic passports.

13.    Waybills, air bills, bills of lading, receipts, delivery notices, and other shipping documentation from the U.S. Postal Service, small package carriers, or common carriers which indicate the shipment of packages and parcels containing controlled substances or firearms.

14.    Electronic Storage media or digital devices used in the commission of, or to facilitate, the above described offenses, including: (i) conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846; (ii) unlawful distribution of heroin and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2; (iii) unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §  922(g)(1); (iv) using, carrying and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1); (v) engaging in the business of dealing in firearms without a license, in violation of

18 U.S.C. §922(a)(1)(A); and (vi) unlawful distribution of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

15.     For any electronic storage media or digital device whose seizure is otherwise authorized by this warrant, and any electronic storage media or digital device that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b.      evidence of software, or the lack thereof, that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

   d.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

   e.      evidence of the times the COMPUTER was used;

   f.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

   g.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

   h.      records of or information about Internet Protocol addresses used by the COMPUTER;

   i.      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

   As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**NOTE**: The search authorized by this Warrant for the subject premises is of the entire premises, including all buildings, outbuildings, garages, yard areas, trash containers, storage areas and containers used in connection with or within the curtilage of said premises and buildings.